UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U S _____ N Y
★ MAR 28 2013 ☆
LONG ISLAND OFFICE

-------------------------------------------------------------X

RICHARD D. LACEY,

          Petitioner,

   -against-

ADA PEREZ,

          Respondent.

-------------------------------------------------------------X

**OPINION AND ORDER**
10-CV-1460 (SJF)

FEUERSTEIN, J.

Petitioner Richard D. Lacey ("petitioner"), proceeding pro se, has filed the instant petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. [Docket Entry No. 1] (the "petition"). A judgment of conviction was entered against petitioner in the County Court of the State of New York, Nassau County, upon a jury verdict finding him guilty of: (1) two (2) counts of burglary in the second degree, N.Y. PENAL LAW § 140.25; and (2) criminal possession of stolen property in the third degree, N.Y. PENAL LAW § 165.50. Petitioner was sentenced as a second violent felony offender to: (1) two (2) consecutive determinate terms of incarceration of twelve and one-half (12.5) years for the burglary convictions; and (2) an indeterminate term of incarceration of between three and one-half (3.5) years and seven (7) years for the criminal possession of stolen property conviction, to run concurrently with the burglary sentences. [Docket Entry No. 9] at ¶ 6. For the reasons that follow, the petition is denied.

I.    Background

    A.    Pre-Trial Proceedings[1]

On July 8, 2002, Sergeant Laurete Harper responded to a burglary in New Hyde Park, Nassau County, where the victim reported that she saw a black male climbing through her window. H. 11-12.[2] Later that day, Sergeant Harper responded to a burglary in East Williston, Nassau County, where the victim reported that she had chased two (2) black males from her back door and observed them get into a black Mitsubishi Eclipse bearing Tennessee license plate number "BER523." H. 12-13. A delivery driver who observed the vehicle at the scene of the East Williston burglary reported the same plate number to Sergeant Harper. H. 72, 74-75. Sergeant Harper classified the two (2) burglaries as part of a pattern of twenty (20) to twenty-five (25) daylight burglaries committed between June and September 2002 where witnesses reported having seen a black Mitsubishi and male black suspects knocking on doors in the neighborhood.[3]

Around August 29, 2002, officers located a black Mitsubishi bearing Tennessee license plate number "BER523" (the "vehicle") in Rockaway, New York and determined that the vehicle

---

[1]    The trial court held a pretrial hearing to determine the admissibility of:  (1) several inculpatory statements made by petitioner to police; (2) a photo identification of petitioner; (3) a show-up identification of petitioner; (4) stolen property recovered from petitioner on September 16, 2002 and during the course of a subsequent consent search of petitioner's apartment; and (5) a knife recovered from petitioner at the time of his arrest. H. 3.  During the course of the hearing, the trial court expanded its scope to address the installation of a tracking device on a vehicle used by petitioner, as discussed in further detail below. H. 54-55. Testimony from the pretrial hearing is summarized here only insofar as it is relevant to the petition.

[2]    References to the hearing transcript are indicated as "H."  References to the trial transcript are indicated as "T."

[3]    On at least two (2) prior occasions, witnesses also reported the "BER523" license plate number to police. H. 20-22, 254.

was registered to Misha Morton (later identified as petitioner's girlfriend) at a Chattanooga, Tennessee address. H. 22, 672. A surveillance team was assigned to observe the vehicle, and on August 21, 2002, officers placed a digital satellite device ("GPS") on the undercarriage of the vehicle to monitor its location when the surveillance team was not in place. H. 23, 80-84. In the week prior to September 16, 2002, a black male driving a white 4Runner was observed visiting the house in Rockaway where the vehicle was parked. H. 678-80. The officers determined that the 4Runner was registered to petitioner and that petitioner had two (2) prior convictions for burglary. H. 678-80.

On September 16, 2002, Detective John Fitzgerald was assigned to the surveillance team monitoring the vehicle. Detective Fitzgerald observed petitioner, wearing a dark suit, get into the vehicle and drive away. H. 25-26, 245-46, 265-67. The surveillance team followed the vehicle, with the assistance of the GPS, and observed petitioner exit the vehicle on Arthur Avenue in Seaford, Nassau County. H. 266-67, 576-82, 682-84. Petitioner returned to the vehicle and drove to Bernice Road, also in Seaford. H. 686. Around the time that officers observed petitioner on Bernice Road, the surveillance team was notified by radio that a 911 caller had reported a burglary at 3860 Arthur Avenue. H. 582, 685-688.

Detective Ceprini responded to 3860 Arthur Avenue and spoke to Jennifer Hester ("Hester"), a twelve-year old girl who was present in the house at the time of the burglary. Hester told Detective Ceprini "that a man had come into the house," "described him as a male black," and stated "that he was wearing glasses . . . [and] had dark clothing on." H. 26-28, 583. Detective Ceprini radioed the surveillance team and indicated that there was a confirmed burglary "and that [he] felt that this was—that our target was involved in this burglary." H. 583.

3

Detective Brian Sweeney, after receiving Detective Ceprini's transmission that "a subject who fit [petitioner's] description . . . just committed a burglary," saw petitioner walk down the driveway of the house at 3994 Bernice Road carrying a black satchel and a canvas bag with the name "Flynn" written across it. H. 274, 689. "[I]nten[ding] . . . to stop [petitioner] and to interview him as to what occurred on Arthur Avenue," Detective Sweeney pulled up next to petitioner as he was opening the back hatch of the vehicle and said, "Excuse me[,] [c]an I ask you a question?" H. 689-90. Petitioner responded, "No," and Detective Sweeney said, "No, I have to ask you a question." H. 689-90. Petitioner then dropped the canvas bag into the back of the vehicle and ran toward the back of a nearby house. H. 274, 690. Detective Sweeney said, "Richard, this is the police. Stop. You're under arrest." H. 690. Detective Fitzgerald, who was parked nearby, pursued petitioner on foot and arrested him. H. 275-77.

The owners of the burglarized homes came to the scene of petitioner's arrest and identified property taken from their homes. H. 590, 695. Officers canvassed Arthur Avenue and found three (3) witnesses who saw a man fitting petitioner's description in the area around the time of the burglary, and all three (3) witnesses positively identified petitioner in a show-up procedure. H. 955-59, 980-82.[4] Before being taken to the police station, Detective Fitzgerald searched petitioner and found a pair of gloves and some coins taken from one of the burglarized residences. H. 281-83.

---

[4]    Petitioner's trial counsel incorrectly asserted in an affidavit submitted in connection with petitioner's motion to vacate his conviction that "[t]he police had testified during the Dunnaway Mapp hearing that [Hester] did I.D. Mr. Lacey in the show-up on the street." [Docket Entry No. 9-22 Ex. C]. In fact, officers testified that they canvassed Arthur Avenue and found three (3) witnesses who saw a man fitting petitioner's description in the area around the time of the burglary and that these three (3) witnesses positively identified petitioner in a show-up. H. 955-59; 980-82. There was no testimony at the hearing that Hester participated in a show-up procedure.

While being transported to the Seventh Precinct by Detective Fitzgerald, petitioner stated: "Someone made me do it. They said they'd kill me. I'm so sorry; it's over for me. I messed up for the past ten years. Some Iraqian guys are after me." H. 284-86. At the precinct, petitioner was interviewed by Sergeant Harper and Detective Fitzgerald and signed a written statement confessing to the burglaries on Arthur Avenue and Bernice Road. H. 294-99.

B.    Trial

Petitioner was indicted for two (2) counts of burglary in the first degree for the burglaries on Arthur Avenue and Bernice Road, four (4) counts of burglary in the second degree for prior burglaries, one (1) count of criminal possession of a weapon in the third degree, and one (1) count of criminal possession of stolen property in the third degree. The trial court submitted to the jury the lesser included offense of burglary in the second degree for the burglaries on Arthur Avenue and Bernice Road. On March 16, 2005, petitioner was convicted of two (2) counts of burglary in the second degree for the burglaries on Arthur Avenue and Bernice Road and one (1) count of criminal possession of stolen property in the third degree. Petitioner was acquitted of the remaining charges.

C.    Post-Conviction Procedural History

On June 6, 2007, petitioner filed a motion pursuant to New York Criminal Procedure Law ("CPL") § 440.10 ("section 440.10") seeking to vacate his judgment of conviction, arguing that: (1) the prosecution withheld a statement made by Hester to Detective Patricia Scalzo on the day of the burglary in violation of Brady v. Maryland, 373 U.S. 83 (1963), see [Docket Entry No. 09-21 Ex. A]; and (2) petitioner was denied effective assistance of counsel by his attorney's failure to call Hester as a witness for the defense. On October 15, 2007, the trial court denied

petitioner's section 440.10 motion, finding that the record was sufficient to permit adequate review of petitioner's arguments on direct appeal. On November 5, 2007, petitioner sought leave to appeal the denial of his section 440.10 motion, and leave to appeal was denied by the Appellate Division of the New York State Supreme Court, Second Department (the "Appellate Division"), on February 25, 2008. On November 21, 2007, upon reargument of petitioner's section 440.10 motion, the trial court issued an order holding that: (1) Hester's statement to Detective Scalzo did not constitute Brady material; (2) there was no reasonable probability that disclosure of the statement would have changed the outcome of the trial; and (3) petitioner was not denied effective representation of counsel by his counsel's decision not to call Hester as a witness. The Appellate Division denied leave to appeal the order.

On July 22, 2008, petitioner appealed from his judgment of conviction, arguing that: (1) petitioner's rights under the Fourth Amendment were violated by the placement of the GPS on the vehicle; (2) the trial court erred in finding that petitioner lacked standing to contest the installation of the GPS; (3) the prosecution stipulated to petitioner's standing to contest the installation of the GPS; (4) petitioner was deprived of effective assistance of counsel by his attorney's failure to assert standing to challenge the installation of the GPS; (5) petitioner was deprived of his right to a fair trial by the prosecution's failure to disclose (until the day before trial) that Hester had participated in a show-up procedure and had failed to positively identify petitioner as the burglar, or alternatively, the trial court erred by failing to reopen the suppression hearings to consider the newly disclosed evidence; and (6) petitioner's sentence was harsh and excessive. Petition at 7-8.

On October 6, 2009, the Appellate Division affirmed petitioner's conviction, holding that:

(1) petitioner failed to demonstrate that he had a legitimate expectation of privacy in the vehicle and thus did not have standing to challenge the installation of the GPS; (2) petitioner was not denied the effective assistance of counsel by his attorney's decision not to call a witness at the suppression hearing to testify to petitioner's use of the vehicle, as "hearing counsel's extensive cross-examination of the People's witnesses expressly addressed the defendant's Fourth Amendment rights"; (3) petitioner's sentence was not excessive; and (4) petitioner's remaining contentions were without merit. People v. Lacey, 887 N.Y.S.2d 158 (App. Div. 2009). Petitioner presented the same claims to the New York Court of Appeals, which denied leave to appeal on April 21, 2008. People v. Lacey, 898 N.Y.S.2d 104 (2008).

On October 22, 2009, petitioner filed the petition, arguing that: (1) petitioner's rights under the Fourth Amendment were violated by the trial court's denial of his motion to suppress evidence obtained through the installation of the GPS; (2) petitioner was denied the right to effective assistance of counsel by his attorney's (a) failure to offer evidence to demonstrate that petitioner had standing to challenge the installation of the GPS, (b) failure to call Hester as a witness at trial, and (c) alleged concession at trial that petitioner committed the Arthur Avenue burglary; and (3) petitioner was denied his right to a fair trial by the prosecution's failure to disclose Hester's statement to Detective Scalzo.

II.     Standard for Habeas Corpus Review

        Pursuant to 28 U.S.C. § 2254(d), an application for a writ of habeas corpus

        shall not be granted with respect to any claim that was adjudicated on the merits
        in State court proceedings unless the adjudication of the claim – (1) resulted in a
        decision that was contrary to, or involved an unreasonable application of, clearly
        established Federal law, as determined by the Supreme Court of the United States;
        or (2) resulted in a decision that was based on an unreasonable determination of
        the facts in light of the evidence presented in the State court proceeding.

"An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and

(2) reduces its disposition to judgment.'" Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007)

(quoting Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)). Claims that were not adjudicated

on the merits in state court are not subject to the deferential standard that applies under AEDPA.

See Cone v. Bell, 556 U.S. 449, 472 (2009) (citing 28 U.S.C. § 2254(d)). Where AEDPA's

deferential standard of review does apply, "[a] state court's determination of a factual issue is

presumed to be correct, and may only be rebutted by clear and convincing evidence."

Bierenbaum v. Graham, 607 F.3d 36, 48 (2d Cir. 2010) (citing 28 U.S.C. § 2254(e)(1)).

Federal habeas review is limited to determining whether a petitioner's custody violates

federal law, see 28 U.S.C. § 2254(a), and "does not lie for errors of state law." Swarthout v.

Cooke, 131 S. Ct. 859, 861 (2011) (internal quotation marks omitted). An unreasonable

application of established federal law occurs "if the state court arrives at a conclusion opposite to

that reached by [the Supreme] Court on a question of law or if the state court decides a case

differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams

v. Taylor, 529 U.S. 362, 412-13 (2000). Alternatively, "a federal habeas court may grant the writ

if the state court identifies the correct governing legal principle from [the Supreme] Court's

decisions but unreasonably applies that principle to the facts of [a] prisoner's case." Id. at 413.

The Supreme Court has stated that "[a]s amended by AEDPA, § 2254(d) stops short of

imposing a complete bar on federal court relitigation of claims already rejected in state

proceedings." Harrington v. Richter, 131 S. Ct. 770, 786 (2011) ("If this standard is difficult to

meet, that is because it was meant to be."). "Section 2254(d) reflects the view that habeas corpus

is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for

ordinary error correction through appeal." Id. (internal quotation marks omitted). A state court's

unreasonable application of law must have been more than "incorrect or erroneous"; it must have

been "objectively unreasonable." Sellan, 261 F.3d at 315 (quotations and citation omitted); see

also Sorto v. Herbert, 497 F.3d 163, 169 (2d Cir. 2007) ("[I]t is well-established in this Circuit

that the 'objectively unreasonable' standard of § 2254(d)(1) means that petitioner must identify

some increment of incorrectness beyond error in order to obtain habeas relief.") (internal

quotation marks omitted).

III.     Analysis

     A.     Fourth Amendment Claims

According to petitioner, he "is asking [the Court] to decide if it's against fundamental

fairness for a prosecutor to prevail on the issue of standing after a suppression hearing when they

never raised or argued the issue of standing." Petition at 54. He argues that "the prosecutor in

the petitioner's case failed in their burden of going forward to show the legality of the police

conduct in the first place when the trial court ruled that the detectives should have first obtained

a warrant before installing the GPS device." Id.

The Supreme Court has held that "where the State has provided an opportunity for full

and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal

habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure

was introduced at his trial." Stone v. Powell, 428 U.S. 465, 494-95 (1976); Young v. Conway,

698 F.3d 69, 85 (2d Cir. 2012) ("Because 'in the case of a typical Fourth Amendment claim,

asserted on collateral attack, a convicted defendant is usually asking society to redetermine an

issue that has no bearing on the basic justice of his incarceration,' habeas relief is unavailable

9

unless the defendant was denied an opportunity for full and fair litigation in state court."").

Therefore, habeas review of Fourth Amendment claims remains available only where "'the state provides no corrective procedures at all to redress Fourth Amendment violations'" or "'the state provides the [corrective] process but in fact the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process.'" Singh v. Miller, 104 F. App'x 770, 772 (2d Cir. 2004) (quoting Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977)).

"[T]he 'federal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in [CPL § 710.10], as being facially adequate." Capellan v. Riley, 975 F.2d 67, 70 n.1 (2d Cir. 1992); see also, e.g., Cotto v. Fisher, No. 09-CV-9813, 2012 WL 5500575, at *20 (S.D.N.Y. Aug. 23, 2012) ("The Second Circuit has long held that Article 710 of the New York Criminal Procedure Law provides a facially adequate mechanism for adjudicating Fourth Amendment claims in criminal proceedings."); Daily v. New York, 388 F. Supp.2d 238, 249 (S.D.N.Y. 2005) ("The State of New York clearly has provided defendants . . . with the necessary corrective procedure through Section 710 of the New York Criminal Procedure Law."); Singh v. Miller, 104 F. App'x 770, 772 (2d Cir. 2004) ("[Petitioner] does not and cannot contend that New York does not provide corrective procedures for violations of Fourth Amendment rights."). Therefore, petitioner must demonstrate that an unconscionable breakdown in the process afforded by New York law prevented the litigation of his Fourth Amendment claims.

The record clearly demonstrates that petitioner was granted an adequate opportunity to fully litigate his Fourth Amendment claims. The trial court held an extensive pre-trial suppression hearing at which the GPS issue was thoroughly addressed by counsel, and the Appellate Division addressed the merits of petitioner's claim on appeal. There is no merit to

10

petitioner's contention that the trial court erred in placing the burden on petitioner to establish his

standing to challenge the installation of the GPS. "To mount a challenge to a search of a vehicle,

[the] defendant[] must show, among other things, a legitimate basis for being in it, such as

permission from the owner." United States v. Ponce, 947 F.2d 646, 649 (2d Cir. 1991). "[T]he

burden is not on the police to show that [a] defendant[] w[as] in the car illegitimately. The

burden is on the defendant[] to show a legitimate basis for being in the car, and that showing

cannot be made simply by having been observed using the car." Id. at 649 (citation omitted).

Petitioner had a full and fair opportunity to establish at the suppression hearing that he had a

reasonable expectation of privacy in the vehicle, and therefore there was no unconscionable

breakdown in the procedure provided by New York law to correct for the alleged Fourth

Amendment violation. See, e.g., Nunez v. Duncan, No. 01-CV-4068, 2003 WL 22284182, at *10

(E.D.N.Y. Aug. 20, 2003) (denying habeas review of the petitioner's claim that the trial court

erred in finding that the petitioner failed to establish that he had a reasonable expectation of

privacy in the dwelling and thus lacked standing to challenge his warrantless arrest, noting that

the petitioner had challenged the trial court's ruling on direct appeal and thus had a full and fair

opportunity to litigate the claim in state court); Mills v. Lempke, No. 11-CV-440, 2013 WL

435477, at *46 (W.D.N.Y. Feb. 4, 2013) (denying habeas review of the petitioner's claim that,

inter alia, the trial court improperly ruled that the petitioner had no standing to challenge the

admission of evidence seized from his father's house, stating that the petitioner "cannot dispute

that he took advantage of the opportunity to litigate these claims in state court"); Carmona v.

Att'y Gen. of State of N.Y., No. 96-CV-8045, 1997 WL 876737, at *8 (S.D.N.Y. Oct. 7, 1997)

(denying habeas review where the petitioner "had a full pre-trial hearing on a motion to suppress

physical evidence . . . and the motion was denied by the court because the petitioner lacked standing to contest the seizure since he was not the owner of the vehicle").[5]

Accordingly, petitioner's claim to habeas relief on the basis of the trial court's failure to exclude evidence obtained in violation of petitioner's Fourth Amendment rights is barred from habeas review and is denied.

B.     Brady Material

After he was convicted, petitioner obtained a witness deposition of Hester taken by Detective Scalzo approximately one (1) hour after the burglary on September 16, 2002, which the prosecution had not disclosed to petitioner's counsel at the time of his trial. [Docket Entry No. 09-21 Ex. A]. Hester told Detective Scalzo that she "look[ed] outside into [her] back yard . . . and saw a black man that looked like he was in his 30's, he had really short, dark brown or black hair, he was wearing glasses, he had a thin build, . . . [and] might have been wearing a grey t-shirt and blue jeans but [she was]not sure." Id.[6] In denying petitioner's motion to vacate his conviction, the trial court found that Hester's "equivocal statements to the police are not Brady

---

[5]     Moreover, to the extent ineffective assistance of counsel may constitute an unconscionable breakdown in the corrective process, cf. Pucci v. Smith, No. 08-CV-6092, 2010 WL 2869480, at *3 (W.D.N.Y. July 20, 2010) ("[E]ven if petitioner was successful in establishing his ineffective assistance claim, this does not equate to an unconscionable breakdown in the [Fourth Amendment litigation] process."), petitioner has failed to establish that he was deprived of the effective assistance of counsel at the suppression hearing, as discussed in further detail below.

[6]     Detective Scalzo stated in an affidavit that "[i]n describing the subject, Hester initially told her that [the man] was wearing a grey t-shirt and jeans, and [she] included that description when [she] reduced [Hester's] statement to writing." [Docket Entry No. 9-29 Ex. A]. However, "[w]hile reviewing the written statement, [Hester] stated that, upon reflection, while she thought the subject was wearing a grey t-shirt and jeans, she was not entirely sure. Therefore, before [Hester] signed the statement, [Detective Scalzo] corrected the language to reflect her uncertainty. [Hester] initialed that correction, along with a few other changes. [Hester] then stated to [Detective Scalzo] that the statement was accurate, and signed it." Id.

material" and that "even if such statements were admitted at trial there is no reasonable probability that such evidence would have affected the outcome of the trial." [Docket Entry No. 9-35].

Petitioner asserts that Hester's statement to Detective Scalzo would have allowed petitioner to impeach Detective Ceprini's testimony at the suppression hearing that Hester had described the burglar "as a male black, . . . wearing glasses, . . . [with] dark clothing on." H. 583. According to petitioner, the accuracy of Hester's description is relevant because Detective Ceprini, immediately after speaking to Hester, notified the surveillance team that there "was a confirmed burglary, and . . . put out the description of the clothing, the dark clothing, and that [he] felt that this was—that [their] target was involved in this burglary." H. 583. Petitioner argues that this radio call was the basis for Detective Fitzgerald believing that there was probable cause to arrest petitioner. Petitioner also asserts that the "withheld written statement describing the perpetrator clearly would have created a reasonable doubt in the minds of the Jury that the petitioner did not commit the burglary at 3860 Arthur Avenue." Petition at ¶ 32.

The Supreme Court's decision in Brady v. Maryland, 373 U.S. 83 (1963), "requires that the government disclose material evidence favorable to a criminal defendant." United States v. Mahaffy, 693 F.3d 113, 127 (2d Cir. 2012). "[T]he government's failure to disclose favorable information will result in an order of retrial if the undisclosed information is 'material,' within the exacting standard of materiality established by the governing case law." United States v. Spinelli, 551 F.3d 159, 164 (2d Cir. 2008). "Evidence is favorable if it is either exculpatory or impeaching, and it is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Mahaffy, 693

13

F.3d at 127 (internal quotation marks and citation omitted). "'[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal,' but rather, a conviction must be reversed 'upon a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Id. (quoting Youngblood v. West Virginia, 547 U.S. 867, 867 (2006)). "[A] new trial is generally not required when the testimony of the witness is corroborated by other testimony, or when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." United States v. Payne, 63 F.3d 1200, 1210 (2d Cir. 1995) (internal quotation marks and citation omitted). "Aside from exculpatory material, Brady applies to material that 'would be an effective tool in disciplining witnesses during cross-examination.'" Mahaffy, 693 F.3d at 131 (quoting United States v. Gil, 297 F.3d 93, 104 (2d Cir. 2002)).

Petitioner has failed to show that the trial court made an unreasonable determination of the facts when it found that Hester's statement was not material. Even without the use of Hester's statement, petitioner's counsel was able to establish that the description given by Hester to Detective Ceprini did not precisely match petitioner's appearance. When asked on direct examination whether "[t]he physical description as well as the clothing description" matched "the description of the [petitioner] as you saw him on Arthur Avenue North or earlier that day," Detective Ceprini answered, "Yes." H. 584. However, when asked the same question on cross-examination, Detective Ceprini said Hester's statement "matched his general description." H. 609. Counsel then established that Hester did not tell Detective Ceprini that the burglar was

thin, tall, or wearing a suit or tie, and that Hester only had a brief opportunity to view the burglar from a distance. H. 610-11. Moreover, Hester's statement to Detective Scalzo (one (1) hour after the burglary) that the burglar may have been wearing a gray t-shirt and jeans is not clearly inconsistent with Hester having told Detective Ceprini immediately after the burglary that the burglar was wearing "dark clothing." Under these circumstances, there was minimal impeachment value in Hester's statement to Detective Scalzo. See Spinelli, 551 F.3d at 165 ("Impeaching information is less likely to be considered material when it 'merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.'") (quoting Payne, 63 F.3d at 1210).

Moreover, the impeachment of Detective Ceprini would not have altered the outcome of the suppression hearing. Detective Ceprini's conclusion that the description given by Hester matched petitioner's general appearance was not the only reason that the officers believed that there was probable cause to arrest petitioner. Detective Fitzgerald, when asked whether he "arrested Mr. Lacey based upon . . . the information given to [him] by Ceprini," Detective Fitzgerald answered, "Partially, yes," and later listed multiple factors independent of Detective Ceprini's radio call that contributed to his belief that there was probable cause to arrest petitioner. H. 362, 400.[7] Furthermore, an officer's subjective belief as to the basis for an arrest is irrelevant

---

[7]     See H. 400 ("Q: The reason why you approached Mr. Lacey and chased him was because you thought he committed the Arthur Avenue burglary, correct? A: Correct. Q: And the reason for thinking that is whatever Detective Ceprini told you, correct? A: Partially, yes. Q: And the fact that you thought his car was near Arthur Avenue at or about the time of the burglary due to the GPS device, correct? A: Yes. Q: Are there any other facts that you relied upon to arrest Mr. Lacey for the Arthur Avenue burglary? A: We saw him, we observed him in the vicinity of Arthur Avenue. Another detective observed his vehicle on Arthur Avenue, observed him walking on Arthur Avenue prior, and the fact that he ran away when the police approached him. Putting all those facts together, plus the description, we relied on all of that. Q: So you knew he was on

to a probable cause analysis, see United States v. Gagnon, 373 F.3d 230, 239 (2d Cir. 2004) ("[A]

law enforcement officer's mistaken belief that probable cause did not exist at the time is

irrelevant to a court's later determination of whether probable cause existed at the time.") (citing

Florida v. Royer, 460 U.S. 491, 507 (1983)), and there was a sufficient objective basis to arrest

petitioner independent of Detective Ceprini's radio transmission, including: (1) the officers'

observation of petitioner on Arthur Avenue around the time of the burglary; (2) petitioner's use

of a vehicle reported by witnesses to have been at the scene of multiple prior burglaries; (3)

petitioner's prior convictions for burglary; (3) the consistency of petitioner's general physical

appearance with descriptions of the suspects obtained from witnesses at prior burglaries; (4)

petitioner's parole officer having seen a photograph in petitioner's home that matched the

description of a photograph stolen at a prior burglary; (5) and petitioner's flight from the officers

when they attempted to speak to him. Furthermore, to the extent petitioner's initial detainment

was only an investigatory stop and did not yet rise to the level of an arrest, a show-up

identification immediately thereafter confirmed that he was near the victims' home on Arthur

Avenue around the time of the burglary, and the burglary victims identified property taken from

their homes in the vehicle. Therefore, even if Detective Ceprini was impeached with Hester's

statement, there is no reasonable probability that the result of the suppression hearing would

have been different.

The prosecution's disclosure of Hester's statement would also not have affected the

outcome of petitioner's trial. As discussed in further detail below with respect to petitioner's

ineffective assistance of counsel claim, it is not clear that Hester's testimony would have been

---

Arthur Avenue from the GPS device and from other police officers. Yes? A: Yes.").

beneficial to petitioner's defense.[8] Moreover, the evidence presented at trial against petitioner with respect to the Arthur Avenue burglary, including his confession and the recovery from the vehicle of property taken from the home, was overwhelming, and there is no reasonable probability that Hester's uncertain recollection of the clothing worn by the burglar would have changed the jury's findings.

Therefore, petitioner's claim to habeas relief upon the basis of the prosecution's failure to disclose Hester's statement to Detective Scalzo is denied.

C.    Ineffective Assistance of Counsel

In order to prevail on a Sixth Amendment ineffective assistance of counsel claim, petitioner must prove that (1) his counsel's representation "fell below an objective standard of reasonableness" measured against "prevailing professional norms," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also Padilla v. Kentucky, 559 U.S. 356 (2010). "In assessing the reasonableness of counsel's performance, judicial scrutiny 'must be highly deferential,' and the court must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" Warren v.

---

[8]    Although the issue is not raised in the petition, petitioner's trial counsel submitted an affidavit in connection with petitioner's motion to vacate his conviction stating that he "would have moved to have . . . Detective Scalzo[] testify at [petitioner's] trial, or at the very least, . . . would have demanded more information surrounding this document to use in [petitioner's] defense." [Docket Entry No. 9-22 Ex. C]. It is unclear what purpose Detective Scalzo's testimony would have served for petitioner at trial, because, as discussed below, Hester's statement to Detective Scalzo was equivocal and would not clearly benefit petitioner's defense.

17

Ercole, No. 07-CV-3175, 2007 WL 4224642, at *11 (E.D.N.Y. Nov. 27, 2007) (quoting Strickland, 466 U.S. at 689 (internal quotation marks omitted)). Moreover, because the AEDPA requires federal courts to give state courts "deference and latitude" when considering an ineffective assistance of counsel claim on habeas review, Harrington, 131 S.Ct. at 786, a petitioner must demonstrate that it was "necessarily unreasonable" for the state court to conclude that the petitioner had not overcome the presumption of competence and that he had failed to undermine confidence in the jury's verdict, Cullen v. Pinholster, 131 S.Ct. 1388, 1403 (2011); see also Harrington, 131 S.Ct. at 785 ("The pivotal question [on habeas review of an ineffective assistance of counsel claim] is whether the state court's application of the Strickland standard was unreasonable.").

1.      Failure to Establish Standing

Although petitioner's Fourth Amendment claims are not cognizable for habeas review, the same bar does not "extend[] to Sixth Amendment claims of ineffective assistance of counsel where the principal allegation and manifestation of inadequate representation is counsel's failure to . . . litigate a Fourth Amendment claim competently." Kimmelman v. Morrison, 477 U.S. 365, 368-75 (1986). "Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." Id. at 375. "Although a meritorious Fourth Amendment issue is necessary to the success of a Sixth Amendment claim . . . , a good Fourth Amendment claim alone will not earn a prisoner federal habeas relief. Only those habeas petitioners who can prove under Strickland that

18

they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ and will be entitled to retrial without the challenged evidence." Id. at 382.

In rejecting petitioner's ineffective assistance of counsel claim, the Appellate Division found that petitioner's "hearing counsel's extensive cross-examination of the People's witnesses expressly addressed [petitioner's] Fourth Amendment rights" and concluded that "the mere fact that counsel's strategy not to call a witness at the hearing regarding [petitioner's] use of the subject vehicle ultimately proved unsuccessful does not amount to ineffective assistance of counsel." Lacey, 66 A.D.3d at 706. Petitioner has failed to show that the Appellate Division's conclusion is a misapplication of the Strickland standard, as the record shows that petitioner's counsel did assert petitioner's Fourth Amendment rights and extensively cross-examined the prosecution's witnesses regarding their knowledge about the owner of the vehicle prior to the attachment of the GPS, the intrusiveness of the GPS, and the information that the GPS provided to the officers.

Petitioner has also failed to show that there were witnesses available who would have supported petitioner's claim to have a legitimate expectation of privacy in the vehicle. See United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987) (denying ineffective assistance of counsel claim where petitioner, inter alia, "does not identify any witnesses that his counsel should have called who would have been helpful," stating that "[d]efense counsel's conduct in this regard appears to fall within the wide range of reasonable professional representation"). As noted by the Appellate Division, the vehicle "was registered to the defendant's girlfriend as of August 29, or 30, 2002, when the GPS was placed on the vehicle," and "[t]he evidence presented at the hearing . . . showed that [petitioner] and his girlfriend got married between the time when

19

the GPS was placed on the vehicle and the time when the subject burglaries took place approximately two weeks later." Lacey, 66 A.D.3d at 705. The record also showed that petitioner used his own white 4Runner, see H. 678-80, and there was no indication that the vehicle was driven by petitioner for any purpose other than committing the burglaries. Although it is theoretically possible that petitioner's counsel could have presented evidence that petitioner frequently used the vehicle with the permission of his girlfriend and had the power to exclude others from the vehicle, such speculation cannot support an ineffective assistance of counsel claim. See Hase v. Holder, 363 F. App'x 133, 135 (2d Cir. 2010) ("[A]n attorney's 'failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel.'") (quoting United States v. Eyman, 313 F.3d 741, 743 (2d Cir. 2002)); Warren, 2007 WL 4224642, at *14 (denying claim that the petitioner was deprived of effective assistance of appellate counsel due to appellate counsel's failure to raise ineffective assistance of trial counsel claim on the basis of trial counsel's decision not to call two (2) witnesses at the suppression hearing to establish the petitioner's standing to contest his arrest in a third-party's apartment, stating that the decision not to call the witnesses at the suppression hearing and at trial "was a tactical decision, and not one that supports a deficiency argument").

Moreover, petitioner has not shown that he was prejudiced by his counsel's failure to establish standing. While petitioner's counsel attempted to establish that the GPS provided the basis for the officers' belief that petitioner committed the burglary on Arthur Avenue, the record shows that the GPS merely assisted the officers in their physical surveillance of petitioner and that the probable cause for petitioner's arrest was supported by substantial evidence obtained without the assistance of the GPS. See H. 1005 ("The Court: . . . [The officers] were watching

20

him and utilized the GPS device to help them in that and nothing else. There's no search or seizure issue with regard to that time frame. It certainly is irrelevant with regard to the suppression issues before the Court."); see also, e.g., United States v. Fisher, No. 10-CV-28, 2012 WL 6913429, at *15 (W.D. Mich. Dec. 12, 2012) ("All GPS derived evidence should be excluded if the Court concludes that a warrant was required to install the GPS units . . . . However, . . . officers used physical surveillance, as well as surveillance by use of the GPS, . . . [and] [a]bsent the information learned from the GPS units, law enforcement officers had a sufficient basis to justify the arrests of defendants and the search of their vehicles."). Therefore, petitioner has not shown that a successful challenge to the installation of the GPS would have resulted in the suppression of evidence material to his conviction.

        2.       Failure to Call Hester as a Witness

       Several days prior to petitioner's trial, the prosecution spoke with Hester's father, who "indicated to [the prosecution] that he believed that [he and Hester] went on what could be classified as a showup and [Hester] said [during the show-up] that [petitioner] was not the person who broke into the house." T. 5.[9] The prosecution disclosed the father's statement the day before the trial, and petitioner's counsel moved to reopen the pretrial hearing. H. 5-18. The trial court denied the motion, stating that "there is clearly an enormous amount of probable cause with respect to the defendant at the time of his arrest and prior to his arrest, including his own conduct at the time the police attempted to stop him." T. 20. Counsel moved to reopen the pretrial hearing again at the conclusion of the prosecution's case, and the motion was denied. T. 984-86.

       According to petitioner, "[o]nce [he] found out that there was a negative show up done

---

[9]     The prosecution appears to have conceded that Hester did in fact participate in a show-up procedure and was unable to identify petitioner. See [Docket Entry Nos. 9-22, 9-32].

and Jennifer Hester actually told the detectives that petitioner was not the man who she saw come into her home, petitioner immediately requested to the trial counsel to have Jennifer Hester come into testify for the defense." However, "trial counsel denied that request, saying that she might cry on the stand." Petition at ¶ 35. Petitioner asserts that "[t]his [decision] could not have possibly been a reasonable trial strategy since the trial attorney had no other defense challenging the 3860 Arthur Avenue burglary" and that "[h]aving Jennifer Hester's written statement and having her testify for the defense would have likely shown the jury that there was a reasonable doubt as to petitioner's committing that crime." Id.

"The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." Nersesian, 824 F.2d at 1321. "[D]ecisions which fall squarely within the ambit of trial strategy, . . . if reasonably made, will not constitute a basis for an ineffective assistance claim." Id. Counsel's decision not to call Hester as a witness for petitioner was not objectively unreasonable, and therefore petitioner has failed to overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.

Although Hester expressed uncertainty regarding the clothing that the burglar was wearing, stating that "he might have been wearing a grey t-shirt and blue jeans but [that she was] not sure," she described the burglar as a "black man that looked like he was in his 30's, [with] really short, dark brown or black hair, . . . glasses, [and] . . . a thin build . . . ." This description matched petitioner's general appearance on the day of the burglary, and it would not be unreasonable for counsel to conclude that Hester's testimony would be harmful to petitioner's

defense. It would also not be unreasonable for counsel to conclude that there was little potential benefit to petitioner in revealing to the jury that a twelve-year old who briefly observed the burglar was unable to positively identify petitioner during a show-up procedure. Moreover, counsel's concern that Hester's testimony would elicit the sympathy of the jury is not illegitimate. See Diaz v. Conway, No. 08-CV-6434, 2010 WL 4365845, at *5 (W.D.N.Y. Nov. 3, 2010) (denying ineffective assistance claim on the basis of counsel's stipulation to the victim's serious physical injury where "defense counsel was able to prevent the jury from seeing and hearing . . . a sympathetic victim"); Marin v. Cunningham, No. 05-CV-3245, 2007 WL 2479855, at *4 (E.D.N.Y. Aug. 27, 2007) (noting that "[t]wo of the witnesses were young and sympathetic, and one cried on the stand when she had to recount what had occurred" in describing the strength of the evidence against petitioner at trial). Given that Hester's likely testimony was not clearly beneficial to petitioner's defense and was in fact potentially damaging, counsel's decision not to call her as a defense witness was not clearly unreasonable and did not, as petitioner asserts, concede his guilt to the Arthur Avenue burglary. See United States v. Schmidt, 105 F.3d 82, 90 (2d Cir. 1997) ("[T]he tactical decision of whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation.").

Moreover, the evidence against petitioner with respect to the Arthur Avenue burglary was overwhelming. Therefore, petitioner has not shown that he was prejudiced by the decision not to call Hester as a witness.

Accordingly, petitioner's claim to habeas relief upon the basis of ineffective assistance of counsel is denied.

23

III.    Conclusion

For the foregoing reasons, the Petition is denied. As petitioner has failed to make a substantial showing of a violation of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253(c)(1). In accordance with Federal Rule of Civil Procedure 77, the Clerk of Court shall serve a copy of this order upon all parties, including petitioner at his last known address.

The Clerk of Court is directed to close this case.


**SO ORDERED.**

/s/ Sandra J. Feuerstein

SANDRA J. FEUERSTEIN
United States District Judge

Dated: March 28, 2013
Central Islip, New York